In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2050

CYRIAC ABRAHAM,

*Plaintiff-Appellant,*

*v.*

WASHINGTON GROUP INTERNATIONAL, INC. and
URS CORPORATION,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 12-cv-198-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED NOVEMBER 8, 2013 — DECIDED SEPTEMBER 9, 2014

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Washington Group, Inc. ("Washington Group"), an engineering, construction and management services company, offered Cyriac Abraham a position as a "lead scheduler" for a construction project in Wisconsin. After a few rounds of negotiations, Washington Group sent Abraham a letter offering him the title of "project control manager"—a position higher up the chain of command than

that of lead scheduler. In this suit, Abraham claims that
Washington Group and its parent, URS Energy and Con-
struction (now URS Corporation) not only offered him the
title, but also promised him that he would perform the du-
ties of a project control manager and then breached that
promise. [1] Washington Group claims that Abraham under-
stood that it would give him the title of project control man-
ager for purposes of increasing his salary but he would per-
form the functions of a lead scheduler on a day-to-day basis.
We affirm the district court's grant of summary judgment
for the Washington Group.

**I.**

Ordinarily we would begin our opinion with a recitation
of the facts, and in the case of an appeal from a dismissal on
summary judgment, we would take those facts in the light
most favorable to the non-movant, who in this case is the
appellant, Abraham. *Miller v. Gonzalez*, Nos. 11-2906,
12-2950, 2014 WL 3824318, *5 (Aug. 5, 2014). The district
court, however, found that Abraham had violated the court's
summary judgment procedures by failing to respond
properly to the defendants' proposed findings of fact. In or-
der to enable the court to determine what facts are disputed
in a summary judgment motion, the district court judge re-

---

[1] Washington Group International, Inc. no longer exists as a legal entity.
On March 23, 2012, Defendants filed a corporate disclosure statement
(R. 2) delineating that URS Energy and Construction, Inc. is the successor
in interest to Washington Group and establishing that URS Corporation
is not a proper defendant in this action. We will refer to the defendants
in this case as "Washington Group." The defendants point out that "even
if Plaintiff's claims could survive summary judgment, unless Abraham
were allowed to amend the complaint to name the only possible defend-
ant (URS Energy and Construction, Inc.), his complaint should be dis-
missed." Because we are upholding the grant of summary judgment to
the defendants, it is unnecessary to decide this issue.

quires through her local rules (as many district court judges do), that the movant submit its proposed findings of fact in a particular manner. If the party opposing the motion for summary judgment wishes to dispute a fact, that opposing party must state her version of the fact and refer to evidence that supports that version in paragraphs numbered to correspond with the movant's facts. The court makes clear that if a party fails to follow the procedures, it will accept the properly proposed fact for purposes of evaluating the propriety of summary judgment. R. 6.

Abraham submitted only his own affidavit which did not respond to the defendant's proposed findings, contained several legal conclusions, and failed to follow the rule in other ways (for example, by failing to answer each numbered fact proposed by the moving party in separate paragraphs, using the same number and stat[ing his] version of the fact and refer[ing] to evidence that supports it.) *See Abraham v. Washington Group*, No 3:12-cv-00198-bbc, R. 26, p. 2–4; *see also Id.* R. 32, p. 2. In this appeal, Abraham does not appear to appeal the district court judge's ruling that he violated the rule or the consequence imposed—that is, that the district court accepted all of the defendants' proposed facts as true. And indeed it would be difficult for him to do so, as this Circuit has routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions, including the precise local rule at issue here. *Schmidt v. Eagle Waste and Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010). We review a district court's application of its own local rules for an abuse of discretion only. *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004). The affidavit Abraham submitted did not meet the requirements of the district court's summary judgment procedures and he made no attempt to correct his mistakes after it was pointed out to him by the opposing party's

brief. At this point in the proceedings, he objects (and only in his reply brief) solely to the characterization of his affidavit as a "sham affidavit," a matter we will discuss along with the other legal analyses in the case. In the meantime, we will continue with the facts as found by the district court.

## II.

Washington Group was in the business of providing engineering, construction, and management services to businesses and government entities. Wisconsin Public Service hired Washington Group to manage a construction project near Wausau, Wisconsin, called the Weston 4 project. In 2004, the plaintiff, Cyriac Abraham, was living in California and working on a short term project in Colorado. Because the job was ending, he began looking for a new position. Mark Maier, a third-party recruiter, contacted Abraham about a position as a lead project scheduler on the Weston project. Abraham applied for the position and shortly thereafter he had a telephone interview with Bob Villa, a project control manager with Washington Group. Villa and Abraham discussed the scheduler position and compensation in the $90,000 range. After the initial interview, Washington Group flew Abraham to Green Bay, Wisconsin, to meet with Washington Group employees Chuck Meyer and Lynn Rohrbaugh, the latter of whom was the project control manager for the Weston 4 project. During the meeting, the three discussed the project in general, but did not discuss Abraham's specific duties and the Washington Group employees did not give Abraham any written materials during the meeting.

After that meeting, Abraham also applied to Fru-Con Corporation for a job as a project control manager on a project in Sacramento, California at a salary of approximately $127,000 a year. Abraham told Maier and Villa that he was going to accept the Fru-Con offer as it was a management

position with higher pay and it was closer to his family who were living in California. In response, Washington Group raised its offer to Abraham. Villa called Abraham and told him that Washington Group could offer him a salary commensurate with that of a project control manager although Abraham would be performing the duties of a scheduler. In order to pay him the higher amount, Villa explained, his title would be that of project control manager, but he would be working under the supervision of another project control manager. Around this time, Washington Group also gave the title of project control manager to other employees in order to fill positions at higher pay. No one at Washington Group discussed performing any project control manager duties with Abraham.

Washington Group sent Abraham a letter dated May 21, 2004, which stated in part:

> We are pleased to confirm our offer of employment to you with the Washington Group International, Inc. Your title will be Project Control Manager with a monthly salary of $8,750 and your assignment will be on our Weston Project in Green Bay, Wisconsin. Your start date is scheduled for June 1, 2004.

R. 16-2.

The offer packet included other standard employment documents, but there was no written job description attached. Abraham accepted the offer on May 24, 2004, and began working as scheduled on June 1, 2004.

Before joining Washington Group, Abraham's sole discussion with any Washington Group employee about job duties was the one he had with Villa over the phone when he was told he would perform the duties of a scheduler despite his title as manager.

For more than a year, Abraham performed his duties as a project scheduler, performing analyses on and managing the schedule, developing procedures, and conducting weekly meetings. On May 27, 2005, Abraham sent the following e-mail to Villa.

> Unfortunately, we both missed or overlooked some points in our earnest desire to close the hiring process speedily, some time in May 04.
>
> • It is a fact that I would not have come to [defendant] if you had not offered a Manager position. I knew the field title was "Lead Project Scheduler."
>
> • You told me there would be a Project Controls Manager. … I did not think he was going to get into scheduling and assumed he would leave that to me entirely.
>
> I think, for me to work as a scheduler under the instructions of some one, that stage has past [sic]. If I try to do that, it will be just a misuse of a valuable resource and I will be doing an injustice to the employer and myself. … I do not have a problem to accept the leadership [the project control manager] on this project. This is a large project and complex … . Unfortunately no one has defined what is the scope of my work … . So I do request you to send me a job description and what you expect me to do.
>
> You have hired me as Project Control Manager at grade 17. But you told me (or did I misunderstand?) this Wednesday that you had no intention to place me as a Manager. Why? I would request you to look at the corporate HR policy on this position, relevant part of which I have copied and

attached for your quick reference. As per this, a [project control manager] at grade 17 "Generally works under the direction of a business unit director, operations manager, regional office manager or project manager." My situation is very different. Why?"

R. 15-1 at 1.

Villa responded by email, stating,

There is still a misunderstanding or miscommunication between you and I … . In our initial discussions prior to you accepting [defendant's] offer, the position I described to you was that of the Lead Scheduler on the Weston 4 project … . When you accepted our offer, my understanding was (and from our conversation this week you confirmed) that you recognized the position you were being hired for was Lead Scheduler and you would report to the [project control manager]. … Because of your experience and capabilities, you were offered a salary that was a grade 17 which has a corporate title of Project Controls Manager. You were hired at the corporate title (and salary) of Project Controls Manager to fill the position of Lead Scheduler. … We do have an organization on the project as you know. Greg is the [project control manager] with full responsibility for the group. But, Cyriac, you are a very important member of the project controls team. … You have full responsibility for managing the schedule on the project, in itself a major responsibility and one you should not take lightly. A major success factor on the project will be meeting this schedule. A job description would be helpful for you and you should discuss this with Greg. …

*Id.* at 2.

Abraham, in turn, responded to Villa's email, stating,

> I really appreciate your reply. **There is nothing in your reply I could disagree with** except for the fact that I am not in the loop on many issues where I need to be on this project. I am upset because various discussions have [taken] place without me where schedule inputs were very important. … Let us leave this discussion here. Greg may learn the value of delegation, or some day I may be able to move into another project when a suitable opportunity arises. …

*Id.* (emphasis ours).

In February 2006, Abraham applied for and then accepted a position with another company which offered him a position in Connecticut with an annual compensation package of $150,000. He resigned from Washington Group on February 17, 2006, and worked his last day on March 3, 2006.

On March 1, 2012, Abraham filed suit in Wisconsin state court alleging that the Washington Group and its parent, URS Corporation breached its contract with him and misrepresented the terms of his employment. Washington Group timely removed the case to the federal district court where the court granted the defendants' motion for summary judgment in its entirety. Abraham filed a timely Rule 60 motion for relief from judgment which the district court also denied. Abraham appeals only the breach of contract claim and, after a de novo review, (*see Seiser v. City of Chicago*, No. 13-1985, 2014 WL 3907111, *4 (7th Cir., Aug. 12, 2014)), we affirm.

**III.**

Abraham contends that the Washington Group breached a contract by hiring him as a project control manager but failing to give him the corresponding duties. As the district court concluded, however, Abraham failed to identify any contract, oral or written, in which the Washington Group promised to give Abraham specific duties that were different than those to which he was assigned. Because of this conclusion, the court held that the case failed to present any genuine disputes of material fact and the movant, Washington Group, was entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Townsend v. Cooper*, No. 12-3620, 2014 WL 3511731, *5 (July 17, 2014).

On one issue the parties agree: The contract—that is, Washington Group's offer letter—was unambiguous on its face. As such, under Wisconsin law, which governs this dispute, the interpretation of an unambiguous contract constitutes a question of law. *Betz v. Diamond Jim's Auto Sales*, 849 N.W.2d 292, 299 (Wis. 2014). When the terms of a contract are unambiguous, a court must construe the contract according to its literal terms and we presume the parties' intent is evidenced by the unambiguous words they chose. *Tufail v. Midwest Hospitality, LLC*, 833 N.W.2d 586, 592 (Wis., 2013). If the terms of a contract are unambiguous, a court is barred from considering any extrinsic evidence such as prior or contemporaneous understanding or agreements between the parties. *Id.* at 593. Unambiguous contract language is given its plain and ordinary meaning, as it is written. *Id.* at 592. And under Wisconsin's parol evidence rule, "When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in

the absence of fraud, duress, or mutual mistake." *In re Spring Valley Meats, Inc. v. Bohen*, 288 N.W.2d 852, 855 (1980).

The only contract between the parties was the offer letter which straightforwardly stated:

> Your title will be Project Control Manager with a monthly salary of $8,750 and your assignment will be on our Weston Project in Green Bay, Wisconsin.

R. 16-2.

Thus the contract offered the following three things: (1) the title of project control manager, (2) a salary of $8,750 per month, and (3) an assignment to the Weston Project in Green Bay, Wisconsin. Abraham received all three of these promised items. The letter does not contain any description of or any promise that Abraham would perform any specific duties.

In the employment discrimination context, we have recognized that it would not be prudent for a court to micromanage an employer's need for flexibility in assigning specific job duties, at least where they do not materially and adversely alter an employee's position for discriminatory reasons. *See e.g. Barton v. Zimmer, Inc.*, 662 F.3d 448, 457 (7th Cir. 2011); *Stephens v. Erickson,* 569 F.3d 779, 790–92 (7th Cir. 2009); *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744–46 (7th Cir. 2002). Abraham is before us with a contract claim, and not an employment discrimination claim, but the policy considerations can be extrapolated. Washington Group entered into a contractual agreement to give Abraham a specific salary and job title at the Weston project. There are many reasons why an employer might decline to elaborate specific job duties in a contract, and the need for flexibility in managing the tasks of any particular project would be chief among them. It is the court's job to respect

the terms of the contract and not manufacture additional terms that are missing. *Seitzinger v. Comty Health Network,* 676 N.W.2d 426, 41 (Wis., 2004)

Although Abraham argues that the court should not have considered extrinsic evidence, in the same breath (or at least the same paragraph), he argues that the circumstances surrounding his acceptance of the offer evinced an intent for him to become the lead project manager. He explains:

> Abraham rejected WGI's offer of employment as a Lead Project Scheduler because he had received an offer of employment as a Project Control Manager from another employer. When WGI learned of that offer, it sweetened the deal and sent Abraham a letter offering him the Position of Project Control Manager.

(Appellant's Brief at 19). And at the same time as he criticizes the district court judge for relying on parol evidence (Reply brief at 8), he urges us to consider his own extrinsic evidence included in his affidavit—first, the fact that he rejected the initial lead scheduler offer for a better one (Id. at 19).

The court correctly determined, as the parties agreed, that the contract was unambiguous and not in need of extrinsic evidence for clarification. R. 26 at 12. Nevertheless, that extrinsic evidence would not have helped Abraham in any event. The evidence demonstrated that during the conversations and negotiations prior to Washington Group's official offer letter, it offered Abraham a position as a project scheduler but with the salary and title of a project manager. If there was any doubt about that agreement, the parties reiterated their understanding in the May 2005 e-mail exchange in which Villa stated, "You were hired at the corporate title (and salary) of Project Controls Manager to fill the

position of Lead Scheduler." R. 15-1 at 1. To which Abraham responded that "There is nothing in your reply I could disagree with." *Id.* at 2.

The only evidence contrary to this assumption was Abraham's affidavit which stated that he had received a job description for the project manager position as part of the conversations surrounding the offer and attaching that description. Even if the district court judge accepted the parol evidence and considered the affidavit, she was ultimately correct to dismiss the evidence in the affidavit, as a deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006). The district court was unpersuaded by Abraham's explanation—which was simply that he forgot that he had earlier received the job description when he sat for his deposition—as are we.

Abraham objects to the characterization of his affidavit as a "sham affidavit" and indeed the term might imply more of a nefarious intent than actually suits the situation. But under Wisconsin law, a "sham affidavit" has a specific definition. It is a descriptive term used to describe an "affidavit that directly contradicts prior deposition testimony" and therefore is considered "generally insufficient to create a genuine issue of fact for trial, unless the contradiction is adequately explained." *Yahnke v. Carson*, 613 N.W.2d 102, 109 (Wis., 2000). Such was the case here.

Abraham received all of the promises set forth in the unambiguous written contract and for that reason there can be no disputed fact of material consequence and the district court correctly found that Washington Group was entitled to judgment as a matter of law.

AFFIRMED